IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 6, 2012

**STATE OF TENNESSEE v. RASHII BRISBON**

**Appeal from the Circuit Court for Rutherford County**
**No. F-65077     Don R. Ash, Presiding Judge**

**No. M2012-00671-CCA-R3-CD - Filed March 13, 2013**

The defendant, Rashii Brisbon, was charged with aggravated child abuse and first degree (felony) murder after the death of a toddler in his care.  A jury convicted him of aggravated child abuse, a Class A felony, but was unable to reach a verdict on the felony murder charge. The trial court sentenced the defendant to serve twenty years in prison.  The defendant appeals, asserting that the State did not present evidence sufficient to support the verdict, particularly the mens rea element, and that the trial court relied on inapplicable enhancement factors during sentencing.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Dicken E. Kidwell and John Taylor, Murfreesboro, Tennessee, for the appellant, Rashii Brisbon.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; William Whitesell, District Attorney General; and Laural Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual and Procedural History

Kymari Clark, the sixteen-month-old victim, had been left in the care of the defendant, who was his step-grandfather. After the victim became unresponsive and the defendant called 911 to report that the victim had possibly been choking, medical personnel determined that he had a large area of blood on his brain as a result of blunt force trauma associated with acceleration-deceleration. The State's expert witnesses testified that the baby had suffered non-accidental trauma, possibly shaking, at the hands of someone with the strength and coordination of an adult, and that his injuries included retinal hemorrhages, swelling of the brain, and bruising on his neck. The defendant's expert witness, whose conclusions were refuted by all other medical witnesses, testified that the victim had suffered from a condition called tuberous sclerosis which caused him to have seizures and that any blunt force trauma was the result of convulsions associated with the seizures. The victim died after two days in the hospital, when it was determined he had suffered brain death.

At trial, the State presented the testimony of Erin Fisher, a dispatcher with the Rutherford County EMS, regarding the defendant's call to 911. Ms. Fisher testified that at approximately 3:09 p.m., the defendant's call was transferred to her. The defendant's recorded call was played for the jury.

During the call, the defendant told Ms. Fisher that the victim was unresponsive and gasping for breath. He stated that the victim had been sitting in the chair and choking or coughing. He said that the victim had just finished eating and then stated that the victim had not been choking but just coughing. He told Ms. Fisher that the victim was breathing and would look at him. He stated that the victim was eighteen months old. Ms. Fisher instructed the defendant several times to hold the victim upright and not to jostle the victim. He denied that the victim could have choked because he said he had been chewing the victim's food for him. When asked again if the victim would acknowledge him, the defendant stated he was "going in and out."

Ms. Fisher testified that at the end of the call, first responders with the Murfreesboro fire department arrived on the scene. Ms. Fisher testified that nothing the caller told her would indicate a seizure, that she commonly took calls reporting children having seizures, and that "[t]his call to me seemed like an airway problem," based on the caller "stating that the child was coughing, choking." Ms. Fisher instructed the defendant to hold the child upright and not to jostle him, which was the instruction she was trained to give in cases where a child is having difficulty breathing. She did not give instructions to treat a seizure. She testified that the victim was later transferred to the pediatric department at Vanderbilt Hospital at some point prior to 7:00 p.m.

-2-

Grady Bilbrey, a firefighter paramedic with the Murfreesboro Fire Department, responded to the defendant's 911 call and arrived with three other firefighters prior to the ambulance. He found the victim lying on a couch, and the defendant told him "that the child had choked possibly on a piece of bread." Mr. Bilbrey testified that the child was breathing and that he had a heartbeat which was slightly more rapid than normal. The victim was unresponsive and did not respond much to painful stimuli. Mr. Bilbrey testified that he did not see anything obstructing the victim's airway and that the victim was breathing, but that the respiratory rate was slower than normal and that he could hear abnormal sounds with the victim's breathing that might indicate fluid or mucus in the lungs. He could not see far down into the victim's throat. Mr. Bilbrey used a bag valve mask to supply the victim oxygen, but did not perform CPR or push on his chest because the victim's heartbeat was adequate. EMS arrived approximately three minutes after the firefighters. Mr. Bilbrey did a quick scan of the victim's whole body and noticed no other injury on the victim. He saw no indication of a seizure. The defendant did not indicate that he had removed anything from the victim's throat, and Mr. Bilbrey saw no food or vomit. The victim was not being held upright when first responders arrived. The defendant was the only adult in the home. Mr. Bilbrey continued to give the victim oxygen during the ambulance ride but did not remember if the defendant rode in the ambulance.

The defense introduced a photograph of the mask portion of a bag valve mask being held onto a patient's head, and Mr. Bilbrey testified that the bag valve mask he used had a soft, flexible seal that had to be held onto the victim's face. On re-direct examination, Mr. Bilbrey testified that his fingers were along the victim's jawline and not in the soft tissue of the neck. Mr. Bilbrey testified that he secured the mask with his left hand on the left side of the victim's face. He stated that he did not recall touching the victim on his neck and that he would have checked the pulse in his arm and not his neck. Mr. Bilbrey's report reiterated that the victim was unresponsive with no obvious injury and that the victim's grandfather had stated the victim was eating bread and began to choke.

Over the defendant's objection, the trial court allowed the State's next witness, Bradly Strohlar, a pediatrician at Vanderbilt Hospital, to give an opinion regarding the cause of the victim's death. Dr. Strohlar testified that another doctor had admitted the victim overnight, and that Dr. Strohlar took over his care in the morning. Dr. Strohlar testified the victim was on a ventilator because his breathing was "agonal," which Dr. Strohlar described as an irregular, gasping breathing which indicates severe brain injury and which would not support life. When Dr. Strohlar first examined the victim, his pupils responded to light "a little bit," he exhibited agonal breathing, and he stiffened to pain. Within twenty-four hours, however, the victim did not respond at all. A CT scan revealed a subdural hemorrhage on the right side of his brain. The victim also had bruises under his chin. Dr. Strohlar testified that "he was having assistance through his airway throughout his presentation so it's unclear how those

-3-

bruises appeared." The victim also had retinal hemorrhages. The pressure inside the victim's head quickly rose to "catastrophic" levels which Dr. Strohlar stated could not be survived.

Dr. Strohlar opined that the combination of injuries very likely reflected an injury at the hands of somebody with the strength and coordination of an adult, and that the victim died of abusive head trauma or blunt force trauma. He testified that the distance between the bones in the victim's neck was abnormally wide, and that, together with the victim's other injuries, this suggested a violent shaking as the source of trauma. He further testified that a violent move could cause a tear in the veins in a young child's brain and cause a subdural hemorrhage. He testified that a short seizure would typically cause no brain damage, and that an extended seizure could cause swelling in the brain, but could not cause retinal or subdural hemorrhage. He testified that he had never seen a child with seizures have injuries similar to the victim's, but commonly saw similar injuries from accident or shaking.

Dr. Strohlar stated that the victim's injuries typically indicated abusive head trauma, and that there was no other disease he was aware of that would cause those symptoms. He further testified that tuberous sclerosis would not cause a subdural hematoma, that he had no reason to suspect that the victim had tuberous sclerosis, and that he had never seen a child with tuberous sclerosis die of a seizure. The victim's retinal injuries were so severe that he would have had to have surgery to be able to see, had he survived. Dr. Strohlar determined the victim's time of death from the time the victim met the federal and state criteria for brain death. Dr. Strohlar reiterated that the cause of the victim's injuries was a violent assault performed by someone with the strength and coordination of an adult. He stated that the force would be more than routine treatment or even aggressive treatment in efforts to resuscitate a child, and that an onlooker's impulse would be to rescue the child from what was happening. When asked if the person applying the force would know he or she was doing it, Dr. Strohlar stated, "I don't know what would go on inside the mind of somebody in that circumstance," but reiterated that an onlooker would feel the impulse to rescue the child.

On cross-examination, Dr. Strohlar testified that it was possible the victim also had seizures, but that seizure would not cause the injuries he sustained. He stated that while the distance between the bones in the neck could indicate injury, he might change his opinion regarding neck injury if the medical examiner found no trauma to the spine. He testified that he would defer to a forensic pathologist as to the cause of death. Dr. Strohlar acknowledged that the doctor who admitted the victim described his condition as fair, but stated that the child was also described as comatose and received critical care upon being admitted, indicating that he was critically ill, and stated that this discrepancy in the chart "annoyed" him. He testified that a clenched jaw might be present if the victim was having seizures.

On redirect examination, Dr. Strohlar reiterated that a seizure could not have caused his brain hemorrhage but the brain hemorrhage, swelling, or other trauma would have caused any seizures.

The victim's mother, Vanessa Clark, testified that at the time of the victim's death, she was in cosmetology school and her mother – Ruby Hall-Brisbon, who was the victim's grandmother and the defendant's wife – offered to assist with the care of the victim. Ms. Hall-Brisbon, the defendant, and their children, a son who was a few weeks older than the victim and a daughter who was two or three, drove to Indiana, where the victim lived with his mother, to pick up the victim and care for him over the summer. The victim lived with the defendant for six weeks before his death, and he was healthy at the time he left his mother's care. The victim's mother testified he had never had seizures or other health issues and he was sixteen months old at the time of his death. While the victim's mother knew that the defendant would be living with her son and providing occasional care, Ms. Hall-Brisbon had sent the victim's mother a picture of a babysitter, and she did not know that the defendant would be the primary caretaker or that he would be providing care for all three children by himself. On cross-examination, the victim's mother testified she had once taken the victim to an emergency room in Indiana, where it was determined he had a fever from teething.

Stephanie Clark, the victim's step-grandmother, had provided care for him prior to his move to Tennessee. She testified that the victim and his mother moved into her household when the victim was three months old and that they lived with her for approximately one year. The victim's step-grandmother, a licensed practical nurse, testified that she accompanied the victim and his mother to doctor's appointments and that he had no health problems. She testified that she specialized in pediatrics for a number of years and was familiar with seizures and that the victim never had seizures. On cross-examination, she acknowledged that the victim had been taken to the emergency room once, but testified that the problem resolved immediately with minor medication.

The State next presented the testimony of David Norton, a police officer with the city of Murfreesboro. Officer Norton was informed of a case of possible child abuse at 4:30 p.m. on June 16, 2010. Officer Norton arrived at the hospital and observed bruising on the right side of the victim's neck. He questioned the defendant about the bruise, and the defendant stated that the victim had climbed on the toilet, slipped, and hit his neck on the bowl. Officer Norton questioned the EMS responders and found inconsistencies between their statements and the defendant's. The investigation was continued by a detective. On cross-examination, Officer Norton affirmed that under Tennessee law, the failure to report suspected child abuse is a misdemeanor.

Detective Tommy Roberts testified that he investigated the case after Officer Norton contacted him regarding suspected child abuse. He observed red marks on the victim's neck. When Detective Roberts initially spoke with the defendant, the defendant stated that the victim had choked on bread. Detective Roberts left the room to take pictures, and when he next asked the defendant what happened, the defendant told Detective Roberts that the victim choked on chicken. Detective Roberts left to speak with the paramedics and with Officer Norton. When he returned the defendant stated that he had forgotten to mention the victim rolled off of a couch. The defendant acknowledged that he had been the only adult in the house. He told Detective Roberts that it had been a normal day, and the victim seemed fine up until he had to be taken to the hospital. Detective Roberts then went to the defendant's residence, where the victim had become unresponsive. He identified pictures of the couches in a carpeted area of the residence and stated he did not see any food in the area while he was there.

Detective Roberts introduced the defendant's telephone records. The records indicate that the defendant made a call to Ms. Hall-Brisbon, the defendant's wife and the victim's grandmother, at 3:05 p.m. The call took thirty-six seconds to connect and lasted one second. At 3:08 p.m., the defendant called Charles Treece. The call connected after twenty-four seconds and lasted three seconds. Also at 3:08 p.m., the defendant received a call from Mr. Treece, and was on the phone with him for fifteen seconds. At 3:09 p.m., he called 911. Detective Roberts interviewed Mr. and Mrs. Treece and the victim's grandmother. The victim died on June 18, 2010, and the victim's autopsy determined the manner of death to be homicide.

Marshall Jones of the Rutherford County EMS testified that he and his partner Jeremy Holmes responded to a call regarding a pediatric patient choking at around 3:10 p.m. on June 16, 2010. He testified that the child was lying on a couch or chair and that emergency responders for the fire department were assisting the child's breathing. Mr. Jones checked the victim's airway and did not see any obstruction, and did not hear any sounds from the victim's lungs to indicate obstruction. Mr. Jones testified that the victim was not having a seizure and was unresponsive. He testified that after a seizure, a patient might be in an unresponsive state but would be able to respond after five or ten minutes, and that the victim never responded and "[i]t was a decreasing situation the entire time we had him." He testified that after a seizure, the patient's heart rate would usually be faster than normal, but the victim's heart rate was significantly slower than normal. Mr. Jones transported the victim to Middle Tennessee Medical Center and later to Vanderbilt Hospital. Mr. Jones noticed bruising and abrasions to the right side of the victim's neck prior to transporting him to Vanderbilt. The bruises were "[n]ot even close" to where firefighters were holding the breathing mask onto the child's face.

On cross-examination, Mr. Jones testified that he did not notice trauma during his rapid trauma assessment at the residence, which he described as checking to see if the patient's limbs were attached or if he was bleeding. He testified that he did not disagree with the initial assessment of the other paramedic that the victim's head, neck, chest, pelvis, and extremities were atraumatic.

On redirect examination, he testified that the victim's jaw was not clenched initially, but that when they tried to insert a small tube to keep the airway unobstructed in the ambulance, the victim's jaw was clenched and they could not safely open his mouth. The victim did not have any seizures between the time the paramedics arrived and when they got him to the truck. Mr. Jones clarified that "atraumatic" indicated simply that he did not note an injury which required immediate attention. He testified that he does not treat internal head injuries and that he probably would not have been able to see injuries inside the victim's head. Mr. Jones testified that the bruises to the victim's neck were not in the same location paramedics would have used to lift his chin to open the airway.

Jeremy Holmes, the other paramedic who responded to the 911 call, testified that he checked the victim for choking and found no particles of food in the child's mouth or airway. He testified that the defendant told him the victim had no allergies or past medical history and was taking no medications. The defendant told Mr. Holmes that the victim was eating bread and "choked and slumped over." The defendant mentioned nothing about a possible seizure, and Mr. Holmes noted no evidence of a seizure. Mr. Holmes testified that the victim was not completely unresponsive because he would respond to taps on the foot by moaning, but he had a decreased level of consciousness. Mr. Holmes testified that he noticed a bruise about three quarters of an inch in diameter on the right side of the victim's neck. The bruise was not where the mask was being held to the victim's face. The victim did not have any seizures, and the victim's vital signs improved somewhat during the ride to the hospital. Mr. Holmes testified that his assessment of the victim's head as atraumatic was limited to what he could see externally, and that he would not have been able to identify internal bleeding. Mr. Holmes testified that his report indicated the victim's jaw was clenched, which might indicate some internal injury to the head. When Mr. Holmes first assessed the victim, his jaw was clenched but he was able to see inside the victim's mouth, which was not completely shut, through a gap in the teeth. He found no evidence of choking or seizures. Mr. Holmes transported the victim, who had been put on a spine board, to Vanderbilt. No traumatic events occurred during transportation, and the victim never regained consciousness. No other adults were in the apartment with the victim. Mr. Holmes did not see any firemen or EMS workers do anything that might have caused the bruise to the victim's neck. On cross-examination, Mr. Holmes stated it was not possible that the bruise came from somebody administering treatment. He explained that the victim's vital signs improved in the ambulance because his low blood oxygen and slow heart rate were increased by the

assistance he was receiving with respiration.

Detective Paul Mongold of the Murfreesboro Police Department assisted Detective Roberts with investigating the case. Detective Mongold overheard the defendant say that the victim had fallen off the couch and he had helped the victim back onto the couch to go to sleep. He also overheard the defendant attribute the injuries on the victim's neck to the victim falling near or around a walker, and the defendant stated that the victim's uncle, who was the same age as the victim, had grabbed him.

Dr. David Whetstone testified he was working in the emergency room at Middle Tennessee Medical Center and that EMS notified him that they were bringing the victim. EMS was concerned that the victim might be seizing and that he was not responding to stimulation. He testified that initially, the defendant was not present. The victim was "moaning" and "posturing" and had "tonic clonic" activity in a manner typical of patients having seizures. When Dr. Whetstone inserted a tube into the victim's trachea to help him breathe, he used a lighted tool and found a mild amount of blood around his airway in his neck but no food or foreign body. Dr. Whetstone testified that there was no obvious source for the blood because, while a seizure might cause a patient to bite his or her mouth or tongue, he did not see any bites during the victim's physical examination.

Dr. Whetstone testified that the victim had bruising and abrasions to his neck, and he asked the defendant where they had come from. The defendant told Dr. Whetstone that the victim had hit his head on the table a week earlier. Dr. Whetstone testified that the injuries were not consistent with a bruise that was a week old. The victim did not wake up as would be typical of a seizure patient, but continued to be unresponsive.

Dr. Whetstone testified that after the initial assessment, he was concerned that the victim had suffered trauma and had a CT scan taken. The CT scan revealed a subdural hemorrhage. Dr. Whetstone testified that the brain hemorrhage could have caused the seizures. He arranged to have the victim transferred to Vanderbilt Hospital and notified Child Protective Services. He testified that a patient could have a head injury without external bleeding or broken bones.

On cross-examination, Dr. Whetstone agreed that the victim might have swallowed the food by the time Dr. Whetstone examined him, and that it was possible that lung secretions revealing minute aspirated food could be found after the victim had died. On re-direct examination, he testified that choking victims often improve markedly with the removal of the obstruction. On re-cross-examination, he testified that a hospital record stating the victim was alert with no acute distress would have been incorrect.

Janet Lowe, a registered nurse at the Middle Tennessee Medical Center emergency room, rode in the ambulance with the victim to Vanderbilt Hospital. She testified that the victim was never alert and that he did not have any seizures on the way.

Dr. Paul Hain testified that he evaluated the victim as part of a "care team," or group of pediatricians who would respond to suspicions of child abuse, at Vanderbilt University Hospital. He testified that there was massive bleeding in all three layers of the retina and in multiple parts of the eye. If the victim had survived, he would have had major vision impairment and possible blindness. He testified that the victim had subdural bleeding which had gone between the hemispheres of the brain. The victim's brain was swollen so that the differentiation between white and gray matter was disappearing, neurons were dying, and the brain was becoming too swollen to function. The victim's circulation had collapsed, and he was on adrenaline to keep his veins open and heart pumping. He testified that the victim's brain injury was catastrophic and the victim's brain swelled until it was nonfunctional. The victim died of brain death. Dr. Hain did not see the victim have a seizure.

Dr. Hain testified that he documented in his consultation note that choking or a short fall would not explain the child's injuries and that the injuries resulted from non-accidental trauma at the hands of somebody with the strength and coordination of an adult. The injuries did not result from casual force, and a normal person observing the injuries being inflicted would panic and try to stop the abuse. Dr. Hain testified that acceleration-deceleration trauma caused the victim's brain to come apart. Such an injury would not necessarily be accompanied by a bruise. Dr. Hain testified that the symptoms would manifest "minutes to moments," and not more than an hour, after the injury. He confirmed that the brain injury could cause seizures. Dr. Hain testified that the type of retinal hemorrhage the victim suffered could only be caused by massive deceleration trauma, such as that inflicted by a high speed automobile accident, a fall from a multiple storey building, or a shaking back and forth. Dr. Hain denied that a seizure could cause the type of brain damage the victim had. He testified seizures could not cause retinal bleeding, either. Dr. Hain rejected the idea that the victim had tuberous sclerosis. He testified that the victim did not have tubers in his brain and that even if there had been tubers, they would not have caused the injuries he sustained.

On cross-examination, Dr. Hain testified that there was no bruising or deformity on the outside of the victim's skull. He testified that the victim had no fractures in his neck but that such a fracture would not necessarily accompany shaking, because in children, the ligaments would generally be injured prior to a fracture. When shown that the patient was described as in "fair" condition on transfer, Dr. Hain testified that "one can use the word fair to mean not dead" but that he "would describe this child as in critical condition bordering on death." He testified that the blood on the victim's brain could not have been caused by disease and that he had treated patients with tuberous sclerosis in the past.

Alisa Libonn testified that she was the social worker in the pediatric intensive care unit at Vanderbilt Children's Hospital and that she was a liaison between the medical team, law enforcement, and the victim's parents. She testified that the victim was very sick and stayed very sick.

Kevin Smith, a child protective services investigator with the Department of Children's Services, testified that he visited the victim and there was bruising on both sides of the victim's neck. Mr. Smith accompanied Detective Mongold to the defendant's residence and spoke with Ms. Hall-Brisbon, the grandmother.

The State's next witness was Charles Treece, whom the defendant called prior to placing the 911 call regarding the victim. Mr. Treece is a stay-at-home father who met the defendant "through an internet business" involving Dr. Tina Gresham. Mr. Treece testified that on the day of the victim's hospitalization he noticed he had missed a call from the defendant, and he called the defendant back. The defendant told him that the victim had fallen off the couch and was choking. Mr. Treece instructed the defendant to call 911 and hung up the phone. He then took his children to the defendant's home, where paramedics and the police were already present. He testified that the defendant and three children, all less than school-aged, were there. Mr. Treece arrived approximately fifteen minutes after he spoke with the defendant. He testified that he had seen the victim before, and the victim appeared healthy and that the other two children were not injured in any way.

On cross-examination, Mr. Treece testified that the defendant sounded upset and concerned when they spoke on the phone. He testified that he had seen the defendant care for the children approximately six to eight times for approximately an hour each time over the course of the three months prior to the victim's injuries. Mr. Treece testified that he had never seen the defendant get upset or show anger towards the children, and he took care of the children in a loving, caring, and gentle way. He never observed injuries on any of the children and never observed the defendant harm, physically discipline, or raise his voice at the children. He never saw the defendant be angry or violent in front of the children, and the children had normal interactions with the defendant.

On re-direct examination, Mr. Treece testified he had only known the defendant for three months. He testified that the victim was present during each of the six to eight times he observed the defendant with the children over a three month period. However, he deferred to the victim's mother regarding the length of the victim's stay in the defendant's home. He stated he did not recall the defendant being upset about an unrelated event on June 16th, and that he did not recall that the defendant was supposed to be in charge of a business meeting.

-10-

Dr. John Davis, a forensic pathologist, performed the autopsy on the victim on June 19, 2010. He testified that the victim had multiple blunt force injuries around his chin and on his neck. He had significant blood on his brain and swelling of the brain. He also had blood around his optic nerve and had retinal hemorrhages. Dr. Davis testified that none of these injuries, with the exception of bruises, would be found on a healthy child. The victim had bruising on both sides of his jaw and on his neck. Dr. Davis said that the cause of death was multiple blunt force injuries, and the death was a homicide. He testified the victim could not have inflicted the injuries on himself.

Dr. Davis testified that some small sections of a vascular membrane of the brain called the leptomeninges were removed as part of the autopsy, and that these areas were not tubers. He testified that a tuber would manifest as a disruption of the gray and white matter of the brain, and that this disruption as not present. Dr. Davis found no evidence of choking. He testified that the injury could not have been accidental because of the amount of blood on the brain and the impact injury to the back of his head. He testified that neither a fall from a couch, a fall against a toilet, a bump into a coffee table, tripping over a walker, nor seizures could have caused the injuries. The injuries could not have been caused by another child but would require the force of an adult. Dr. Davis saw no white hairs, a symptom of tuberous sclerosis, on the child. He also did not find a shagreen patch, a major criterion of tuberous sclerosis, which Dr. Davis described as a yellow-brown area of raised skin that could have a leathery or rubbery feel. Dr. Davis testified that the only discoloration on the victim was a Mongolian spot.

On cross-examination, Dr. Davis testified that a seizure could not cause a subdural hemorrhage. He did not test for metabolic disease or vitamin deficiency, and noticed no congenital malformation. He testified that while there can be other causes of retinal hemorrhage besides trauma, the "depth and degree" of the victim's retinal hemorrhages made it "much more likely" that they resulted from trauma. He testified he did x-rays of the victim and found no food, and that consolidation in the lungs was due to pulmonary edema and congestion as a result of the injuries to his brain. He testified on redirect that Dr. Shaker, the defendant's expert, had access to all his slides and pictures and had requested tissue samples that were unstained.

Dr. Davis explained that the victim also had a bruise of the tissue between the scalp and the skull. He stated that a bruise alone would not explain the victim's injuries, and that it showed that something hit his head along with the other injuries he sustained while being shaken.

The defense called Dr. Adel Shaker, a medical examiner for the state of Mississippi, to testify as an expert in forensic pathology. Dr. Shaker stated that because he was a medical

examiner, he rarely testified for the defense. Dr. Shaker testified that the victim died of blunt force trauma to the head as the result of uncontrollable seizures associated with tuberous sclerosis. Dr. Shaker introduced photographs of the victim's brain, on which he claimed to identify white lesions known as tubers. He also identified a photograph of dark patches on the victim's lower back and bottom which he stated were shagreen[1] patches, or "leathery skin with some dimple like an orange peel" and which are associated with tuberous sclerosis. In a photograph of the deceased victim's face, Dr. Shaker pointed out what he identified as Ash Leaf Spots, or areas of skin which contain less pigment and are associated with tuberous sclerosis. He also identified what he claimed was a small patch of white hair, another symptom of tuberous sclerosis. Dr. Shaker clarified that there were three levels of diagnosis for tuberous sclerosis: definite, probable, and suspect. He stated the victim had probable tuberous sclerosis.

He stated that he agreed with Dr. Davis's findings except for the conclusion regarding the mechanism of the blunt force trauma. Dr. Shaker opined that a seizure associated with tuberous sclerosis caused the victim to bang his head. Dr. Shaker testified that although at first he was skeptical of the defendant's story, he found minute food particles in the terminal bronchials, which indicated that the victim was choking on food, which was suctioned out by the emergency medical technician. He stated that the trauma could not have been due to child abuse because there was no hemorrhage of the conjunctiva of the eye, no bruising to the inner lips of the victim, and no fracture of any rib, no older injuries, and no fractures in the hands or legs. He claimed that if the child had been abused, "there would be contusion and bruises on the soft tissue of the neck" and that abuse "would result in at least one or two rib fractures."

On cross-examination, Dr. Shaker denied that he had previously been in trouble for falsifying autopsies in Africa and denied being accused of falsifying an autopsy report in Mississippi. Dr. Shaker stated he was being paid $250 per hour by the defense. Dr. Shaker acknowledged that he had recently testified in Georgia for another defendant but stated he was not aware that he was scheduled to testify for the defense in another Georgia case. He stated that perhaps his boss was "referring cases" to him, but acknowledged that his boss had testified against him in Georgia.

Dr. Shaker denied that the areas of light pigmentation he identified were due to a camera flash; however, he stated that the area of lighter pigmentation would have been present at birth and subsequently acknowledged that he could not see the patch in a picture of the victim as an infant. He testified that he had previously diagnosed tuberous sclerosis for the first time during an autopsy on two prior occasions. He acknowledged that the

---

[1]Dr. Shaker incorrectly spelled this out as "schgreen" for the court reporter.

victim's caretakers would have seen what he had identified as a patch of white hair on the child. He testified that a machine called a striker was used to open the skull during autopsy but denied that the striker would ever cut into the soft tissue of the brain. He denied that the areas he had identified as tubers were in a straight line, and marked what he identified as additional tubers on the photograph where he had originally marked three tubers. He also testified that the areas he claimed were shagreen patches would feel rough and that the child would have been born with them. He then claimed that the patches could pass unnoticed "unless they reach a certain age or they are females." Dr. Shaker testified that no genetic tests were run for the presence of tuberous sclerosis due to limited resources.

Dr. Shaker testified that a child whose fontanelle was not closed could accommodate more bleeding in the brain, and he believed the injury could have taken place three days before the victim became ill. He testified that choking on bread could have triggered a seizure. He agreed that he was not an expert in tuberous sclerosis. Dr. Shaker further claimed that the victim's retinal and optic nerve hemorrhages were the result of increased pressure in his brain and that the retinal hemorrhages were not the result of abuse because there was no retinal detachment, holes or hemorrhage in the posterior chamber of the eye. He agreed that the victim could not have sustained the injuries from falling against a toilet or walker or falling from a couch. Dr. Shaker testified that if the victim had been shaken by an adult, there would have been broken bones. However, he acknowledged that if an adult shook the victim by holding his clothes, there would be no broken bones, only neck bruises. He testified that the neck bruises on the victim were caused by a neck brace.

Dr. Mark Levaughn, the chief medical examiner for the state of Mississippi and Dr. Shaker's supervisor, testified to rebut Dr. Shaker's conclusions. He testified that the victim died of blunt force injury to the head, and that he saw no evidence of tuberous sclerosis. He testified that the white spot in the victim's hair was debris, that there was no ash leaf spot on his face, and that the victim had Mongolian spots, or pigment under the skin, and not shagreen patches. He testified that he commonly saw Mongolian spots during autopsies, had never seen a shagreen patch, and that the area did not "even look close to" photographs he had seen of shagreen patches. He testified that what Dr. Shaker had identified as tubers were areas where the membrane covering the brain had been cut with a striker saw. He testified that Dr. Shaker's testimony regarding how a skull would be cut to remove the brain was incorrect, and that a striker saw could cause a cut to soft tissue, especially when used to cut an infant's skull. Dr. Levaughn was compensated for his plane ticket and hotel room but was not being paid to testify; he had found out about the case and "was appalled and offered to give an opinion." He testified that this was the second time in the eight months he had been chief medical examiner that he had offered testimony to rebut Dr. Shaker in a case. Dr. Levaughn testified he agreed completely with Dr. Davis's report and that the manner of death was homicide. He testified that the injuries could not have been caused by a fall from a

couch, bumping into a toilet or walker, choking, or seizures.

Dr. Kevin Ess, a child neurologist, testified that he was one of twenty experts worldwide in tuberous sclerosis. Dr. Ess had seen tubers in the live brains of "dozens and dozens and dozens" of patients during surgery and stated that the areas identified by Dr. Shaker looked nothing like tubers. Ninety percent of patients with the disease would have obvious seizures within the first six months of life. Dr. Ess had never seen subdural hemorrhages in his three to four hundred patients with tuberous sclerosis. He also testified that the disease would cause tumors in multiple organs and that there were no findings of tumors, which would have been obvious. According to Dr. Ess, the areas on the victim's lower back "look nothing like" shagreen patches. He testified he had seen thousands of seizures in children and had never seen them result in an injury to the brain like the victim's injury. He stated that Dr. Shaker's report contained factual errors, misspellings, and incomplete statements. He stated that Dr. Shaker's claim that patients with tuberous sclerosis frequently die suddenly and unexpectedly was incorrect and that death occurred incredibly rarely or never. On cross-examination, he testified that a brain injury can cause seizures or posturing. On re-direct examination, he testified that the victim's brain died over the course of one to two days.

The defendant, a stay-at-home father, testified that in May 2010 the sixteen-month-old victim moved in with him, his wife, his two-year-old daughter, and his son who was also sixteen months old. He testified that his wife left for work at 7:30 in the morning and his son and daughter woke around 9:00 a.m., but the victim was still asleep because he had a cold and had been given medication. He testified that he fed, bathed, and dressed his two children and put them in front of the television while he made calls and worked on his internet business. He testified that the victim, who was not yet walking well, woke up, and he bathed and dressed him and put him with the other children into the living room, and then began to make him pancakes and chicken and to clean the kitchen. He said that the victim was sick and "whining" and fell asleep on the couch while the defendant cleaned the bathroom and kitchen. The defendant let him sleep and continued making his breakfast and cleaning the kitchen. The victim woke up after fifteen or twenty minutes, and the defendant had not finished making breakfast. The defendant gave the victim a piece of bread, sat him in the kitchen where he could see him from the bathroom, and went to clean up the bathroom. When he returned, the victim was slumped over and appeared to be choking. He was gasping for breath and gurgling. The defendant looked in his mouth and didn't see anything. He put the victim on the couch and began to make telephone calls. He called his wife, Charles Treece, and 911.

The defendant testified he told the emergency responders that the victim was choking on bread and that he told Mr. Treece the victim had fallen from the couch earlier in the day

and had been choking on bread. He testified that he witnessed the injuries to the victim's neck, and that it was his sixteen-month-old son who inflicted the injuries as the two children fought over the walker. The defendant stated that he rode to the hospital in the passenger seat of the ambulance. He told doctors and a social worker that the victim had fallen off the couch, that he had patted the victim back to sleep on the couch, that he had fed him bread while cooking pancakes, and that he went into the bathroom and when he returned the victim was slumped over and choking. The defendant went to Vanderbilt Hospital, where his wife joined him. He testified that he never hit the victim, never disciplined any of the children, and had never been violent or forceful with the children or hurt them.

On cross-examination, the defendant confirmed he was the only adult at home after his wife left. He stated that in the three minutes between the time he called his wife and the time he called Mr. Treece, he was "trying to make sure the child was okay." He testified that the victim fell from the couch while he was cooking breakfast. The defendant made approximately fifty business-related phone calls that day. He testified that he never gets frustrated with children. He testified that he did not accidentally or knowingly cause any harm to the victim. He testified that the victim could not walk but would crawl and that while the defendant was cleaning the tub a week earlier, the victim was pulling up, the victim's hand slipped off the toilet seat, and he hit his chin. He testified that he never told Dr. Whetstone that the victim fell on a coffee table. The defendant recalled telling the 911 operator he chewed the victim's food for him and stated he was chewing the victim's chicken. He denied telling Detective Roberts that the victim had choked on chicken, and said he had told everyone that the victim choked on bread. He testified that he had taken off the victim's shirt sometime between the morning and when paramedics arrived, but that he did not do so to hide anything on the shirt. He testified that he laid the victim down even though the 911 operator told him to hold the victim upright because he did not know he should continue to hold him upright.

Ruby Hall-Brisbon, the defendant's wife and victim's grandmother, testified that the defendant was a good father and was peaceful and playful with the children. She testified that he treated the victim the same as his own children. She did not notice any injuries on the victim while he lived with her. She testified that she stopped by her apartment for insurance papers after she found out the victim was in the hospital. She did not see any food on the table when she arrived, and Detective Roberts arrived immediately afterwards. The defendant told Ms. Hall-Brisbon that the victim had choked. He told her he was cooking pancakes for the children and that the victim had been asleep but fallen off the couch. He told her the victim wouldn't stop crying and he laid him back down and fed him bread or pancakes and then the victim started choking. She did not notice any growths or blotches on the victim. She stated that she might have sent her daughter a picture of a babysitter but that they had agreed that the defendant would take care of the children. The victim had not had

any health problems other than a cold. She stated the defendant did not tell her about any falls the victim had had.

Dr. Tina Gresham testified that she was a self-employed cardiologist who also had an "internet-based business" and who first met the defendant in February or March 2010. She observed the defendant and his two children on four or five occasions before the victim moved in, and stated that the defendant was attentive, and the children loved him and were well-behaved. She testified that she observed the defendant with the victim six or seven times and that he did not treat the victim differently from his children. She did not observe the defendant display anger or frustration toward the children, and he didn't raise his voice other than to tell them to go sit down. She stated that the defendant had control over the children and that they respected him.

Earle Gresham, Dr. Gresham's husband, also testified that he had "an internet-based business" and that he taught families to start home-based businesses. He testified he first met the defendant in March or April 2010. He testified that he saw the defendant with his two children, and the defendant was very attentive and was caring and loving. He testified he saw the defendant with the victim several times, and there was no difference in the defendant's care of the victim and the other children. He did not see the defendant angry or violent towards or in the presence of the children.

The State called several rebuttal witnesses. Detective Roberts testified regarding the apartment's layout and that there were no stairs in the apartment or leading up to it. The victim's step-grandmother testified that the victim could eat by himself, had teeth, and could chew his own food, and she had never had to chew food for him. She testified that the victim was bathed every day, that his skin was smooth, that he had no leathery skin, and that he had Mongolian spots on his bottom. She testified that he had no white hair or light-colored spots on his body. He had never had seizures. The victim's mother also denied the presence of these phenomena associated with tuberous sclerosis.

The jury found the defendant guilty of aggravated child abuse, but was unable to reach a verdict on the felony murder charge. The defendant moved for a new trial, alleging that the State had failed to prove that he acted knowingly with respect to the results of his conduct. The trial court denied the motion. At the sentencing hearing, the victim's grandfather testified regarding the impact of missing out on the victim's life. The victim's step-grandmother testified that she had a breakdown after the trial and was just returning to work. Her fifteen-year-old daughter had become suicidal at the thought that someone could murder the victim, and her other children were in counseling. The victim's mother also testified that it was difficult to live without him. The State argued that the defendant's sentence should be enhanced, and the defendant argued that the enhancement factors filed

by the State either did not apply or were elements of the offense. The trial court stated on the record that it considered the factors listed in Tennessee Code Annotated section 40-35-210(b). It found no mitigating factors and enhanced the defendant's sentence based on: the fact that the victim was particularly vulnerable based on age or disability; the personal injuries inflicted on the victim were particularly great; the defendant had no hesitation about committing a crime where the risk to human life was high; and the defendant abused a position of trust. The trial court sentenced the defendant to twenty years' imprisonment to be served at 100 percent. On appeal, the defendant asserts that the State did not present sufficient evidence to prove each element of the offense beyond a reasonable doubt. The defendant also objects that his sentence was enhanced beyond the minimum in the range.

## II. Analysis

### A. Sufficiency of the Evidence

We interpret the defendant's first three issues – that the verdict was contrary to the weight of the evidence, that the elements of the crime were not proven beyond a reasonable doubt, and that the proof did not show the defendant acted knowingly – as a challenge to the sufficiency of the evidence. An appellate court must set aside a finding of guilt if the evidence at trial was insufficient to support that finding beyond a reasonable doubt. Tenn. R. App. P. 13(e). In evaluating the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The appellate court may not reweigh the evidence and may not substitute its inferences for those drawn by the trier of fact. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences to be drawn from it. *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003). The guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant bears the burden of proving that the evidence did not support the verdict. *Id.*

On appeal, the defendant asserts that the State failed to show that the defendant acted knowingly. In addition, the defendant objects that the trial court's definition of "knowingly" only included the nature of the conduct and not the result of the conduct. The defendant also objects that the circumstantial evidence did not establish a web of guilt from which the only reasonable inference was that he was guilty of the crime beyond a reasonable doubt.

While the defendant objects that the circumstantial evidence was not so strong as to exclude every reasonable hypothesis other than the defendant's guilt, the Tennessee Supreme Court, in *State v. Dorantes*, rejected the requirement that the prosecution disprove every hypothesis save guilt beyond a reasonable doubt. *State v. Dorantes*, 331 S.W.3d 370, 380 (Tenn. 2011). Instead, direct and circumstantial evidence should be treated the same when weighing the sufficiency of the evidence. *Id.* at 381. Accordingly, the standard of review when reviewing a conviction based on circumstantial evidence remains whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Id.* at 379-81.

Tennessee Code Annotated § 39-15-401(a) (2010) makes it an offense to "knowingly, other than by accidental means, treat[] a child under eighteen (18) years of age in such a manner as to inflict injury." Child abuse becomes aggravated child abuse with the addition of serious bodily injury to the child. T.C.A. § 39-15-402(a)(1). Serious bodily injury to a child includes "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." T.C.A. § 39-15-402(d). Aggravated child abuse becomes a Class A felony if the abused child is eight years of age or less. T.C.A. § 39-15-402(b).

A person acts knowingly with respect to the conduct "when the person is aware of the nature of the conduct or that the circumstances exist," and a person acts knowingly with respect to the result of the conduct "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). The defendant objects that the trial court did not instruct the jury on knowingly as it applies to a result-of-conduct offense. Generally, an offense is a result-of-conduct offense when the result of the conduct is the only element contained in the statutory definition of the offense. *State v. Hanson*, 279 S.W.3d 265, 276 (Tenn. 2009). The statutory definition of aggravated child abuse contains elements other than the result of the conduct, and the Tennessee Supreme Court has held that aggravated child abuse is a nature-of-conduct offense. *Id.* "As a nature-of-conduct offense, the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that the defendant was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in so doing, he acted other than by accidental means." *Dorantes*, 331 S.W.3d at 386; *see also State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000) (holding "that the mens rea of 'knowing' refers only to the conduct elements of treatment or neglect of a child under the child abuse statute and … that the child abuse offenses are not result-of-conduct offenses"). Accordingly, we conclude that it was not error for the trial court to refrain from instructing the jury on the definition of knowingly as it applies to a result-of-conduct offense. Furthermore, we conclude that the defendant's challenge to the

sufficiency of the evidence, insofar as it alleges the State failed to prove his awareness that his conduct was reasonably certain to cause the victim serious bodily injury, is without merit.

The evidence at trial established that the victim was less than eight years old and that he suffered, among other injuries, subdural bleeding, retinal hemorrhage, and brain edema; the victim died as a result. Mr. Bilbrey, Mr. Jones, Mr. Holmes, Dr. Whetstone, and Dr. Davis testified that they found no evidence that the victim had choked on food. Mr. Bilbrey, Mr. Jones, and Mr. Holmes saw no indication of seizure when the victim was first assessed for injury. Mr. Jones, Mr. Holmes, Dr. Whetstone, Dr. Strohlar, Mr. Smith, and Dr. Davis noted bruising on the victim's neck. Dr. Whetstone also noted blood in the victim's throat with no obvious source. Dr. Whetstone, Dr. Strohlar, Dr. Hain, and Dr. Davis found a subdural hemorrhage. Dr. Strohlar, Dr. Hain, and Dr. Davis testified that the victim had massive retinal bleeding and that his brain was swollen. Dr. Davis found a bruise under the victim's scalp. Dr. Strohlar, Dr. Hain, and Dr. Davis testified that the victim died from a non-accidental injury at the hands of someone with the strength and coordination of an adult, and Dr. Levauhgn testified that he agreed completely with Dr. Davis's conclusions. Dr. Strohlar and Dr. Hain testified that the injury required such force that a normal person observing the traumatic event would have had the impulse to rescue the victim. Dr. Hain, Dr. Davis, Dr. Levaughn, and Dr. Ess testified that the victim did not have tuberous sclerosis, and Dr. Hain and Dr. Ess testified that tuberous sclerosis would not have caused his injuries. The victim's mother and step-grandmother testified that the victim had previously been healthy and that the physical signs of tuberous sclerosis identified by Dr. Shaker were absent. While Dr. Shaker testified that the victim died of head trauma resulting from seizure associated with tuberous sclerosis and that the victim's death was due to disease, it is clear from the verdict that the jury found Dr. Shaker's testimony to be at a minimum not credible, if not irresponsible, possibly perjurious, and deserving professional sanction.

By the defendant's own testimony, he was the only adult with the children from approximately 7:30 a.m. until he called 911 at a little after 3:00 p.m. The defendant was unable to account for the bulk of the day, and he allowed three minutes to elapse after his initial call to his wife regarding the victim's injury. The defendant offered numerous and inconsistent accounts of how the victim suffered injury both prior to and during trial – that the victim choked on bread or chicken, that the victim fell against the toilet or a walker or a table, that the victim fell off the couch, and that another sixteen-month-old had injured the victim. The defendant's wife and three recent acquaintances stated that he was not violent with the children. The jury was called on to determine whether it found the testimony of the medical experts who stated that the victim died of non-accidental trauma at the hands of an adult or the testimony of the defendant, which did not account for the injuries, more compelling. The evidence was sufficient for the jury to find that the defendant, who was the only adult in the home at the time of the injury, treated the sixteen-month-old victim in such

a manner as to inflict serious bodily injury.  The medical testimony that a person witnessing the traumatic event would panic and want to rescue the child was a sufficient basis for a rational trier of fact to infer that the defendant acted knowingly in that he was aware of the nature of his conduct.  This Court may not substitute its inferences for those of the jury, and we conclude that this issue is without merit.

## B. Sentencing Issues

The defendant also challenges his sentence, contending that all of the enhancement factors found by the trial court were improperly applied.  The defendant argues that the trial court could not properly have found that the personal injuries inflicted on the victim were particularly great, since serious bodily injury was an element of the offense.  He likewise alleges that, because the offense requires that the victim be less than eight years old, the trial court improperly relied on the fact that the victim was particularly vulnerable because of age or physical or mental disability.  He objects that the record is silent regarding whether the defendant hesitated to commit a crime where risk to human life was high.  The defendant concedes that courts have approved the use of the defendant's abuse of a position of trust as an enhancement factor in similar cases, but submits that this, too, is an element of the crime because the victim was under eight years old.

The State concedes that the fact that the victim's injuries were particularly great is an element of the crime.  The State likewise concedes that there was no evidence regarding the defendant's hesitation in committing a crime where the risk to human life was high.  However, the State argues that the remaining two enhancement factors – that the victim was particularly vulnerable due to age and that the defendant abused a position of trust – are sufficient to support the sentence.

When a trial court's sentencing decision reflects a proper application of the purposes and principles of the Sentencing Act, the sentence is reviewed for an abuse of discretion. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  Furthermore, a sentence that falls within the appropriate statutory range, like the one at issue in this case, and reflects a proper application of the purposes and principles of the Sentencing Act, is granted a presumption of reasonableness.  *Id.*  In this case, the defendant was sentenced as a Range I offender, and the sentencing range was fifteen to twenty-five years.  T.C.A. § 40-35-112(a)(1).

Tennessee Code Annotated section 40-35-114 mandates that "the court shall consider, but is not bound by" certain enhancement factors "[i]f appropriate for the offense and if not already an essential element of the offense."  The defendant challenges the application of enhancement factor (4), a finding that the "victim of the offense was particularly vulnerable because of age or physical or mental disability."  T.C.A. § 40-35-114(4).  The defendant

alleges that age is already an element of the offense. Aggravated child abuse becomes a Class A felony when the victim is under eight years of age. T.C.A. § 39-15-402(b). That the victim's age falls below the threshold is an element of the offense which the State must prove beyond a reasonable doubt. *Ducker*, 27 S.W.3d at 899.

Nevertheless, the fact that age is an element of the crime does not, in itself, prohibit the use of the vulnerability enhancement factor. *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993), *superseded by statute on other grounds, as stated in State v. Jackson*, 60 S.W.3d 738, 741-42 (Tenn. 2001). The relevant inquiry is "whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date." *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997). While "[a] vulnerability that is wholly irrelevant to the crime" may not be used to enhance a sentence, a vulnerability that fits the above criteria may be used by the trial court. *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001). The State must present evidence of vulnerability in addition to evidence of age, but the evidence need not be extensive. *Id.* Additional weight may be given to age when the victim is extremely young or old. *Poole*, 945 S.W.2d at 97. This court has previously approved the use of this enhancement factor in a conviction for aggravated child abuse. *State v. McField*, No. E2009-02472-CCA-R3-CD, 2011 WL 2534856, at *19 (Tenn. Crim. App. Sept. 28, 2011); *State v. Tallant*, E2006-02273-CCA-R3-CD, 2008 WL 115818, at *32 (Tenn. Crim. App. Jan. 14, 2008); *State v. Benn*, No. E2001-01958-CCA-R3-CD, 2003 WL 934240, at *11 (Tenn. Crim. App. Mar. 10, 2003); *State v. Gates,* No. E1998-00131-CCA-R3-CD, 2000 WL 46005, at *6 (Tenn. Crim. App. Jan. 21, 2000); *State v. Frazier*, No. M1998-00498-CCA-R3-CD, 1999 WL 1209518, at *6 (Tenn. Crim. App. Dec. 17, 1999). Here, testimony showed that not only was the victim more vulnerable to the injuries associated with shaking due to his age, but he was also unable to walk unassisted, and – according to the defendant – chew his own food. The sixteen-month-old victim could not summon help or testify. This factor is amply supported by the record.

The defendant likewise claims that enhancement factor (14), the defendant's abuse of a position of public or private trust, is essentially an element of the crime because a child eight or under must always be entrusted to a supervising adult. The Tennessee Supreme Court has stated that the position of parent, step-parent, babysitter, teacher, and coach are "a few obvious examples" of positions of trust. *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). Moreover, "[w]here the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." *State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999). Despite the defendant's assertion, not every adult occupies a position of private trust with respect to a child under eight. *Kissinger*, 922 S.W.2d at 489 (concluding that a casual visitor did not occupy a position of trust). Here, the victim's mother entrusted the victim to the defendant's

-21-

household while she finished her schooling. The victim's mother testified that she was told that a babysitter would be caring for her son, and the defendant would provide only incidental care. The defendant, however, ended up as the main caretaker of the victim. The trial court properly found that the defendant abused a position of trust.

The State concedes error in the application of the remaining two enhancement factors. We note that a court may in certain circumstances rely on factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, to enhance a sentence for aggravated child abuse because the State may prove serious bodily injury without showing a risk of death. *State v. Trehern*, No. E2009-00066-CCA-R3-CD, 2010 WL 2695635, at *13 (Tenn. Crim. App. July 7, 2010); *see also State v. Jordan*, No. 01C01-9801-CR-00021, 2000 WL 85364, at *19 (Tenn. Crim. App. Jan. 27, 2000); T.C.A. § 39-11-106(a)(34)(A). Furthermore, although the defendant claims there was no proof of a lack of hesitation, the Tennessee Supreme Court has clarified that the determinative language in this factor is that the risk to human life was high since hesitation is rarely probative of culpability and does not readily lend itself to proof. *State v. Jones*, 883 S.W.2d 597, 602 (Tenn. 1994), *superseded by statute on other grounds, as recognized in State v. Carico*, 968 S.W.2d 280, 288 n.9 (Tenn. 1998). The State also concedes error in the application of factor (6) that the personal injuries inflicted upon the victim were particularly great. "[P]roof of serious bodily injury will always constitute proof of particularly great injury." *Id.* Moreover, this court has described death as the "ultimate serious bodily injury." *State v. Neighbours*, No. M2000-02594-CCA-R3-CD, 2002 WL 489223, at *5 (Tenn. Crim. App. Mar. 28, 2002). The relevant inquiry in determining whether the factor may be applied is "whether the facts which establish 'serious bodily injury' are the same facts which show that the injury was 'particularly great.'" *Jones*, 883 S.W.2d at 602. While courts have concluded that this factor was improperly applied when death constituted the serious bodily injury that was an element of the crime, *e.g.*, *State v. O'Neal*, No. M2008-00146-CCA-R3-CD, 2009 WL 2951269, at *8 (Tenn. Crim. App. Sept. 15, 2009); *Tallant*, 2008 WL 115818, at *31, we note that there was ample evidence of serious bodily injury – including subdural and retinal hemorrhages and brain edema – apart from the evidence of the victim's death.

Nevertheless, even if we accept the State's concession that these factors were improperly applied to enhance the sentence, we conclude that the sentence should be upheld.

> [A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence

imposed by the trial court within the appropriate range should be
upheld.

*State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). A straightforward application of this holding to the current case demonstrates that the sentence assigned by the trial court should be upheld. Even if we were to conclude that the trial court erred in applying some of the enhancement factors, there were "other reasons consistent with the purposes and principles of sentencing" for imposing the within-range sentence. In *Bise*, the Tennessee Supreme Court upheld a sentence in the middle of the range even though it found that the sole enhancement factor had been improperly applied. The trial court in *Bise* had relied on the need for deterrence and on the defendant's intoxication, which the Tennessee Supreme Court concluded were "sound reasons" to impose the sentence. *Bise*, 380 S.W.3d at 709. Here, the defendant's abuse of a position of trust and the victim's vulnerability provide a firm basis for the trial court's decision. The trial court did not abuse its discretion.

## CONCLUSION

Because we conclude that the evidence is sufficient to support the verdict and that the trial court did not abuse its discretion in imposing a sentence, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE